## AMERICAN LIFE INS. CO. v. MOYNAHAN et al.

### No. 8551.

Court of Civil Appeals of Texas. San Antonio.

Feb. 18, 1931.

Rehearing Denied March 18, 1931.

Eskridge & Groce, of San Antonio, for appellant.

Boyle, Wheeler, Gresham & Terrell, of San Antonio, for appellees.

SMITH, J.

This is an action to cancel an insurance policy issued by the American Life Insurance Company upon the life of Doc Nixon, whose death occurred within less than one year from the issuance of the policy. The insurance company brought the suit to cancel the policy upon the ground that the insured committed suicide, in which contingency there could be no recovery, as stipulated in the policy. The beneficiaries reconvened, and, upon a jury finding that the insured did not commit suicide, recovered judgment for the amount of the policy, with interest, penalty, and attorneys' fees. The company appealed.

The controlling contention of appellant is that the evidence showed as a matter of fact that the insured's death was intentionally caused by his own act; that he committed suicide by shooting himself with a pistol.

At the time of his death insured was about 60 years old. He was survived by a brother and a grown son and daughter; his wife having died about five years prior to his death. In former years he had prospered moderately, but in later life had lost his property, after which he lived irregularly, spending some of the time with his daughter, some of it with his son, and much of the last few years with a couple named Winters, who were not related to him. Apparently, he was always welcomed at the home of each of those mentioned, was respected generally, and had many friends. The evidence tended to show that he was of a cheerful jovial disposition up to the time of his death. His dead body was found lying on the ground under a tree near the highway, about a half mile north of the town of Devine, at about 6 o'clock on a Thursday morning. He was last seen alive by any witness in the case at the preceding midnight, at the roadside about a half mile south of the town of Somerset, twenty miles north of where his body was found next morning. His movements in the meantime, how he got from Somerset to the place his body was found, are matters of the purest conjecture. That he walked the whole way from the one place to the other is wholly improbable. Prior to midnight he had gone into a roadside resort near Somerset, bought and drank a Coca-Cola, paid for it out of a purse in which he had, and exposed to others, an undetermined sum of money, probably a very small sum. The owner of the roadhouse, one Spencer, and his wife were then preparing to close the place of business for the night, and, according to their testimony, the insured asked them to take him in their car to Somerset, to which they assented. They drove him to a point indicated by him, which was near the home of George Winters, where he often spent the nights, and let him out by the roadside. He paid them 50 cents, which he took from his purse, which he opened in the car dash light, disclosing one or two bills and some change in the purse. The Spencers then turned their car around and drove away, leaving him by the roadside. He was seen no more alive. This was just before midnight. His dead body was found about five or six hours later, at a point near Devine, twenty miles away.

Parties in that vicinity saw a car parked by the roadside near where the body was found at about 4:30 that morning. Shortly after it was noticed there, this car moved on down the highway and disappeared, and no explanation of the incident appears in the record. When the body was found, the dead man's purse and its contents, which he had when last seen alive, were missing and were never found.

The record is confusing concerning the discovery of the body. It is not clear as to just who first saw it and approached it. The evidence is likewise confusing as to tracks leading to and from the body. One or two witnesses seem to have testified that the tracks of only one person led to the body, and that these tracks, made in soft sand, fitted the measurements of the deceased's shoes. Other testimony had the effect of contradicting that evidence sufficiently, at least, to render it inconclusive.

When the coroner reached the body, it lay stretched full length on its back, the left arm, bent at the elbow, pressed the deceased's hat to his side, with the hand resting on the body. The right arm lay, extended, upon the ground, the hand resting a few inches from a small, 22-caliber, pistol, identified as having belonged to the deceased. The only two shells in the pistol had been exploded, one of them apparently some time before, the other, resting under the hammer, but recently. A small bullet wound, surrounded by evidence of powder burns, was disclosed in the left breast, from which there had been a very slight flow of blood. No autopsy was had upon the body, nor was any search made for other wounds than that made by the pistol bullet, and no inference may be drawn from the evidence that other wounds were or were not on the body. There was no evidence of any struggle between the deceased and others, or of any writhings or paroxysms of the deceased. His body lay, simply, at full length in a composed and natural position. Grass burrs were clinging to the bottoms of his trouser legs, which were damp, as if from the dew, raising an inference that he had walked alongside or away from the paved highway at some time during the night.

We believe we have fairly set out the material evidence of the physical facts disclosed in the record. Undoubtedly the jury could have easily found it to be a case of intentional self-destruction, some witnesses having testified to facts which, if found to be true, supplied motive and purpose. On the other hand, however, the theory of robbery and murder, and a cunning disposal of the body to conceal that theory, is supported by sufficient circumstantial evidence—it is a case purely of circumstantial evidence, of course—to warrant the jury in rejecting a finding of suicide. It is a travesty upon a wholesome respect for law and regard for human life and property, that the latter theory is rendered reasonable and plausible in these troublous times when murder and robbery and related crimes have become so common that no person's life or person or property is surely safe in any lonely place, or anywhere else, for that matter.

The decedent had the Spencers drop him by the roadside, at a byroad leading to the nearby home of George Winters, where he usually spent his nights when in that vicinity. The jury could very reasonably have inferred that it was his intention to spend the night with the Winters as usual. The Winters,

however, had other company that night, leaving no room for the decedent. If he approached the house, discovered the situation, and then started afoot down the highway towards his daughter's home at Devine to spend the night with her, is not shown, but such may be inferred. If he was taken aboard a passing car, at his own request or otherwise, and carried on towards his daughter's home, is not shown, but it is likewise inferable. If he did board another car, it is impossible to conjecture satisfactorily what happened to him. It is easily conceivable, from similar incidents daily reported in the newspapers of the land, that, traveling with strangers, he was assaulted, robbed, shot with his own pistol, and deposited in a carefully planned attitude by the roadside where his body was later found. It is by no means impossible to conjecture that he was stunned, or forcibly pinioned, by his companions, who, finding so little money on his person that they pressed his own pistol to his breast and shot him in resentment of the poor returns from their exploit, and, being done with him, carefully deposited him by the roadside. It is a matter of common knowledge, gained from almost daily reports of like incidents in the newspapers of the times, that bandits often become so incensed at the poverty of their victims that they often insult, sometimes beat, and in some instances kill them in resentment. But, aside from these unnecessary observations, the circumstances of this case warranted the jury in rejecting the suicide theory in favor of the theory that the decedent was robbed and slain by others, who placed him in the position in which he was found, and then drove on their murderous way. This theory is greatly strengthened, first, by the fact that in the short time available he could not have walked all or a very substantial part of the way to his doom, but must have been driven all or part of the way by passing motorists, presumably not by friendly acquaintances; second, by the presence of the mysterious car between 4 and 5 o'clock in the morning at the point where his dead body was found, with its pockets rifled, an hour or two later; and, third, by the implied jury finding, upon sufficient evidence, that the decedent had no motive for, or intention of, suicide.

■■ Some witnesses testified that the decedent had been despondent for some time prior to his death, which they sought to attribute to his grief over his wife's death five years before; that he had often expressed an intention to commit suicide, even with the very pistol found by his dead body. This testimony was from the mouths of witnesses whose relations to the decedent were such, according to the evidence, as to create at least a trace of suspicion that they had a motive for bolstering the suicide theory. The effect of their testimony was contrary to the testimony of other witnesses. It was the peculiar province of the jury to resolve this conflict. The jury saw the witnesses, observed their conduct and manner on the stand, heard their testimony, weighed it in the balance with the testimony of other witnesses from the same stand. Obviously the jury were not impressed with the credibility of their testimony, and rejected it as being outweighed by the testimony of the other witnesses. In this the jury but exercised a prerogative inherently theirs, and this court nor the trial court may question their determination of the issue thus raised.

■■ In short, appellant failed to show a motive or intention of suicide. We cannot say from a consideration of all the evidence in the case that reasonable minds could not differ upon the issue of the cause of the insured's death, and, the jury being in the best position to pass upon that issue, their finding thereon, being upheld by the trial judge, is conclusive upon this court.

■ The only other complaint urged by appellant is directed at the arguments of appellees' counsel to the jury. This complaint does not in our opinion present reversible error. It appears that in his argument to the jury one of appellees' counsel contended that the burden rested upon appellant to "prove" to the jury's "satisfaction, according to a preponderance of the evidence," that the decedent committed suicide; that, the case being one purely of circumstantial evidence, it was the duty of appellant to make a complete chain of such evidence on the issue of suicide; that, if there was "one weak link, if there is one link missing in this chain," the jury would not be justified in finding that the decedent committed suicide. Appellant urges reversal on account of this argument. We overrule the contention as being obviously without merit.

Appellant also complains of certain strictures in the argument of appellees' counsel upon the attitude assumed in the case by the decedent's son. We conclude that circumstances upon the trial, as disclosed in the record, warranted the speculation indulged in by counsel upon this subject, and overrule appellant's objection thereto. No reversible error is presented concerning the remaining argument complained of.

The judgment is affirmed.